CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
1/23/2025
LAURA A. AUSTIN, CLERK
BY: s/ CARMEN AMOS
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| JOSHUA WANN, | ) |
|  | ) |
| *Plaintiff,* | ) |
|  | ) |
| v. | ) Civil Action No. **6:25CV00009** |
|  | ) |
| NATURAL BRIDGE HOTELS LLC, | ) **JURY TRIAL DEMANDED** |
|  | ) |
| SERVE:  Ugandhar Mukkamala | ) |
|           27175 Paddock Trail Pl | ) |
|           Chantilly, Virginia 20152-6364 | ) |
|  | ) |
| *Defendant.* | ) |

## COMPLAINT

Joshua Wann ("Mr. Wann" or "Plaintiff"), by and through undersigned counsel, brings this action against Defendant Natural Bridge Hotels LLC, ("Natural Bridge" or "Defendant") under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), and Va. Code § 40.1-27.3.

### I. INTRODUCTION

1. This case involves interference and retaliation under the FMLA against whistleblower-plaintiff, Mr. Wann. Plaintiff has evidence that Defendant, through its authorized agents: (1) interfered with Mr. Wann's statutorily created rights under the FMLA; and (2) retaliated against Mr. Wann and terminated him shortly after he returned from FMLA leave under the pretext that Defendant "eliminated" the Food and Beverage Director position. Plaintiff also has evidence that Defendant terminated him after he made multiple complaints of violations of Virginia law.

## II.   JURISDICTION AND VENUE

2. This action arises under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., and Va. Code Ann. § 40.1-27.3.

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331.

4. This Court has supplemental subject matter jurisdiction over the claims arising under Virginia state law because they are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C.§ 1367(a).

5. Venue lies in the Western District of Virginia, Lynchburg Division, under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred here.

## III.   PARTIES

6. Plaintiff, Joshua Wann, is a legal resident of the Commonwealth of Virginia.

7. Mr. Wann worked at the Natural Bridge Hotel between June 2022 and June 2024.

8. Mr. Wann exercised his rights under the FMLA to care for his extremely ill father.

9. Defendant unlawfully interfered with Mr. Wann's rights under the FMLA and terminated Mr. Wann shortly after he exercised his statutorily created rights under the FMLA.

10. Natural Bridge Hotels LLC is a Virginia limited liability corporation with its principal place of business located at 27175 Paddock Trail Pl, Chantilly, VA, 20152.

11. Natural Bridge Hotel is located at 15 Appledore Lane, Natural Bridge, Virginia 24578.

12. Natural Bridge Hotel sits on 200 acres and has 152 rooms, two restaurants, and a conference center for weddings, business meetings, and other gatherings.

13. Between 2022 and 2024, Natural Bridge Hotel employed between 65-100 employees.

## IV. LEGAL FRAMEWORK

### A. The Family and Medical Leave Act

14. Under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., full-time employees who have worked a year or more for their employer are entitled to a total of 12 work-weeks of unpaid leave withing a 12-month period, subject to exceptions not relevant here.

15. Under the FMLA, the term employer "means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(i).

16. An eligible employee may use this leave for several reasons, including "[t]o care for the . . . parent of the employee, if such . . . parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).

17. The term "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves continuing treatment by a health care provider. 29 U.S.C. § 2611(11).

18. Employees may use their 480 hours (12 work-weeks) of FMLA leave intermittently and only the hours used each day are subtracted from their available hours of FMLA leave. 29 U.S.C. § 2612(b)(1).

19. Any employee who takes FMLA leave shall be entitled, on return from such leave to be restored by the employer to the position of employment held by the employee when the leave

commenced; or to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1)(A), (B).

20. An employer violates the FMLA when it "interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1).

21. Under 29 CFR § 825.300(b)(1), when an employer acquires knowledge that an employee's leave **may** be for an FMLA-qualifying reason, the employer **must** notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances. (Emphasis added.)

22. The eligibility notice must state whether the employee is eligible for FMLA leave. 29 CFR § 825.300(b)(2).

23. Failure to follow the notice requirements constitute an interference with, restraint, or denial of the employee's rights under the FMLA. 29 CFR § 825.300(e).

24. An employer violates the FMLA when it "discharge[s] or in any other manner discriminate[s] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(D)(a)(2).

25. Under 29 U.S.C. § 2617, affected employees are entitled to be reinstated to their previously held position and may recover all lost wages and benefits, plus an equal amount of liquidated damages, plus attorney fees and costs.

B. **Virginia's Whistleblower Statute, Va. Code § 40.1-27.3**

26. Under Va. Code § 40.1-27.3, "[a]n employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because

4

the employee: [o]r a person acting on behalf of the employee in good faith reports a violation of any federal or state law or regulation to a supervisor …."

27. Under Va. Code § 40.1-27.3(C), "A person who alleges a violation of this section may bring a civil action in a court of competent jurisdiction within one year of the employer's prohibited retaliatory action. The court may order as a remedy to the employee (i) an injunction to restrain continued violation of this section, (ii) the reinstatement of the employee to the same position held before the retaliatory action or to an equivalent position, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs.

## V. STATEMENT OF FACTS

28. Mr. Wann has worked in the food and beverage industry since he was sixteen years old and has experience working in almost every facet of a restaurant.

29. Mr. Wann also has also gained extensive management experience managing multiple restaurants over the past decade.

30. On or around June 1, 2022, Mr. Wann was hired as the Restaurant Tavern Manager for the Natural Bridge hotel.

31. Mr. Wann was then promoted to the position as Food and Beverage Director about a month or so later.

32. As the Food and Beverage Director, Mr. Wann was responsible for the entire execution of the food and beverage department, including managing food costs, beverage costs, coordinating events, hiring and firing employees, scheduling employees, assisting in payroll, and performing accounting functions for his department.

33. At any given time, Mr. Wann managed between ten and twenty other employees.

34. Mr. Wann earned a salary of $57,000 per year, received paid-time-off, and received sick leave.

35. Over the following year and a half, Mr. Wann thrived in his position and the restaurant experienced extensive growth.

36. Mr. Wann was responsible for everything food and beverage related including managing multiple different events going on at the same time, coordinating with food trucks, ensuring all food and beverage operations were operating efficiently, cooking, providing customer service to patrons, planning with the chefs to create menus, covering shifts, and ultimately overseeing the entire department.

37. Sometime around September 2023, Mr. Wann was introduced to Vijitha Gutta as the new owner of Natural Bridge.

38. While the new ownership continued to operate the same business at the same location using the same employees, supervisors, equipment, etc., and provided the same goods and services to customers, Mr. Wann immediately became concerned with the new ownership.

39. Within Ms. Gutta's first month of ownership, she attempted to classify all Natural Bridge employees, including Mr. Wann, as 1099 independent contractors.

40. Mr. Wann was very outspoken about this decision and told Ms. Gutta he was <u>not</u> an independent contractor and that classifying him as such was **<u>illegal</u>**. (<u>See</u> **Exhibit 1**.)

41. Mr. Wann cited to Ms. Gutta the exact statutes that stated classifying him and other employees at the Hotel was illegal in Virginia.

42. Ms. Gutta also eliminated all employee benefits, including paid-time-off sick leave.

43. As a result of these changes, many employees began to leave, which left the Hotel short of employees.

44. In December 2023, Ms. Gutta began hiring illegal immigrants as kitchen staff to fill the void.

45. Mr. Wann told Ms. Gutta that hiring illegal immigrants was unlawful and asked her if she would "hire people that are local instead."

46. Throughout Mr. Wann's employment, Mr. Wann consistently cited Virginia laws to Ms. Gutta and explained what they were allowed to do and what they were not allowed to do.

47. For example, the Natural Bridge Hotel has a liquor license which allowed them to sell alcohol on the property at the restaurant and be able to sell closed bottles in the gift shop.

48. For one event, Ms. Gutta wanted Mr. Wann to provide a keg service to a cottage, which is located across from the hotel.

49. However, under Virginia law, the only way Mr. Wann would have been able to do so is if they had a separate liquor license for that cottage.

50. Because he would have to violated Virginia law to comply with Ms. Gutta's request, Mr. Wann refused to provide such service to the cottage.

51. Ms. Gutta attempted without success to convince Mr. Wann to still provide the service to the cottage.

52. Around this same time in December 2023, Mr. Wann's father became extremely ill.

53. At the time, doctors were unsure what Mr. Wann's father was suffering from, but it was very serious and life-threatening.

54. Mr. Wann informed Natural Bridge's Human Resources Manager, Deborah Hansford, of his father's condition and that he may need to take time off to care for his father.

55. Ms. Hansford was very supportive of Mr. Wann and told him to take care of his father and to let her know if he needed anything.

56. Mr. Wann thanked Ms. Hansford and continued to work his normal schedule.

57. However, around January 2024, doctors notified Mr. Wann that his father had been diagnosed with terminal cancer.

58. Mr. Wann considered resigning from his position at the Hotel to be with and help take care of his father.

59. At no point did anyone at Natural Bridge Hotel inform Mr. Wann about the FMLA or his ability to take FMLA leave.

60. As a result, Mr. Wann did not know that the FMLA existed or how to request FMLA leave.

61. Mr. Wann spoke to Ms. Hansford about the possibility of resigning so he could care of his father.

62. Even though Ms. Hansford was the Human Resource Manager, she **never** mentioned to Mr. Wann about the possibility of FMLA leave.

63. On January 20, 2024, Mr. Wann sent Ms. Hansford a text message indicating his intention to resign to care for his father. (See **Exhibit 2**.)

64. Ms. Hansford was very understanding of Mr. Wann's position and told him not to do anything until he spoke with Ms. Gutta and Mr. Mukkamala. (See **Exhibit 2**.)

65. Mr. Wann also notified Ms. Gutta of his father's condition and that he considered resigning as well.

66. Ms. Gutta **never** told Mr. Wann that he could qualify for FMLA.

8

67. Mr. Wann then met with Mr. Mukkamala to try and find a way he could continue to work and care for his father.

68. Mr. Mukkamala told Mr. Wann he wanted Mr. Wann to continue working at the Hotel and he would pretend this conversation never happened.

69. A few days later, Mr. Wann was speaking to a family member and learned for the first time about FMLA and that he could qualify for FMLA leave.

70. Mr. Wann was told that under the FMLA, he could take time off to care for his father without resigning from his job.

71. Mr. Wann then asked Ms. Hansford about the possibility of taking FMLA and requested the necessary paperwork to request FMLA leave.

72. Ms. Hansford told Mr. Wann that she needed to "ask Vijitha."

73. On January 26, 2024, Mr. Wann sent a text message to Ms. Hansford and told her that he intended to file paperwork to take FMLA leave and provide her with the paperwork the following day. (See **Exhibit 3**.)

74. The following day, on January 27, 2024, Mr. Wann sent a text message to Ms. Hansford asking if his request for FMLA leave had been approved. (See id.)

75. Ms. Hansford indicated that she was not working and would not be in until the following Monday. (See id.)

76. Mr. Wann also sent a text message to Ms. Gutta that same day on January 27, 2024, asking about his ability to fill out FMLA paperwork, and again, Ms. Gutta refused to supply him with the documents or respond to his messages. (See **Exhibit 4**.)

77. Instead of responding to Mr. Wann's requests for FMLA leave, Mr. Wann received an e-mail later **that same day** from Ms. Hansford (who supposedly was not working that day) with Ms. Gutta and Mr. Mukkamala copied on the e-mail.

78. The e-mail had a subject line of "Resignation Acceptance Letter" and stated, "Dear Josh, We received your resignation dated 1/20/24. After careful consideration, **we accept your resignation** effective 1/20/24." (See **Exhibit 5**.) (emphasis added.)

79. Mr. Wann was extremely confused at this message as he **never** provided any resignation letter to anyone.

80. The only thing Mr. Wann could think of was the text message he sent Ms. Hansford on January 20, 2024, indicating he was notifying the Hotel he would be resigning in two weeks. (See **Exhibit 2**.)

81. However, Mr. Wann **only** sent that text message because Mr. Wann was unaware of FMLA and the fact he could qualify for it.

82. Mr. Wann rescinded that notice once he learned about FMLA and after Mr. Mukkamala rejected his proposed future resignation.

83. Ms. Hansford sent this e-mail **after** she indicated to Mr. Wann that she "was not working," and **after** Mr. Wann asked Ms. Hansford and Ms. Gutta about the status of his FMLA paperwork.

84. Mr. Wann refused to accept this e-mail and notified Natural Bridge that if they attempted to terminate him, it would be considered retaliation.

85. Mr. Wann informed Natural Bridge that they could not do that and that he **only resigned because he did not know about FMLA leave** – something that should have been told to him when he considered resigning

10

86. Because Ms. Hansford and Ms. Gutta refused to provide Mr. Wann with the appropriate FMLA paperwork, Mr. Wann decided to find the paperwork himself and printed FMLA paperwork he found online.

87. On January 30, 2024, Mr. Wann provided his own FMLA paperwork to Ms. Hansford and requested FMLA leave.

88. Eventually, Natural Bridge allowed Mr. Wann to take FMLA leave and originally scheduled him to return sometime in February 2024.

89. However, once Mr. Wann returned from FMLA leave, he still needed more time to help care for his father and began to use FMLA leave intermittently.

90. Throughout the rest of February and March, Mr. Wann used FMLA leave intermittently to care for his father.

91. During this period, Ms. Hansford left a folder in the restaurant containing a document drafted by Ms. Hansford discussing Mr. Wann's request for a short extension of his FMLA leave.

92. On his paperwork was a note which stated, "Doing away w/position," "Find another job," "Leave Date," "Will use you in other duties until your end date." (See **Exhibit 6**.)

93. Mr. Wann immediately texted Ms. Hansford and asked her if it was **his FMLA paperwork** that she had left out. (See **Exhibit 7**.)

94. Ms. Hansford replied that it was and that she must have "accidentally" left it out. (See id.) (emphasis added.)

95. Ms. Hansford did not mention the note that she put on his FMLA paperwork.

96. On March 31, 2024, Mr. Wann's father unfortunately passed away.

11

97. On or around April 7, 2024, Mr. Wann returned from grieving his father to work his normal schedule.

98. On his return from FMLA leave, Mr. Wann noticed multiple changes had been made to his role as Food and Beverage Director.

99. As mentioned *supra*, as the Food and Beverage Director, Mr. Wann had the ability to hire and fire, the ability to schedule employees, access payroll, and perform accounting functions.

100. These job duties are essential to Mr. Wann's role and his ability to manage his employees in an effective way.

101. Once Mr. Wann returned from FMLA leave, he found that Natural Bridge had greatly reduced his managerial ability.

102. Mr. Wann was told he was required to clock in and out, which he was never required to do before.

103. Natural Bridge also did not allow Mr. Wann to perform any accounting functions and denied him the ability to access payroll.

104. Overall, many of the tasks which allow Mr. Wann to perform his role at a high level were completely taken away from him.

105. Because of this, it became very difficult for Mr. Wann to manage his employees and maintain accurate financial records.

106. Once Mr. Wann's employees learned that he could not discipline them, they began displaying blatant disrespect towards him.

107. This added more stress on Mr. Wann and greatly interfered with Mr. Wann's ability to perform his job.

108. Mr. Wann was first told he **could not hire and fire anyone**.

109. When Mr. Wann asked why he couldn't hire anyone, Ms. Gutta told Mr. Wann she wanted to have smaller employee numbers. Ms. Gutta stated that she wanted to eliminate all of the "weekend warriors," which are employees who only work one or two shifts over the weekend.

110. Ms. Gutta specifically stated she "**needed to get the number under 50**."

111. Mr. Wann then sarcastically asked Ms. Gutta if she was doing it "for insurance purposes," to which Ms. Gutta reluctantly replied, "Yes."

112. Mr. Wann complained multiple times to Ms. Hansford and Ms. Gutta about the drastic changes to his role but was simply told, "other people are now doing those jobs."

113. Sometime around April 2024, Natural Bridge was in the process of opening another area to serve as a private event space.

114. This new space also had a kitchen which needed to pass certain Virginia health code regulations.

115. Upon inspection, it was found that the kitchen had not passed multiple sections and would need to be fixed before the kitchen could be used.

116. Mr. Wann was in constant contact with the inspector who notified Mr. Wann to contact him and let him know when the violations were fixed.

117. Before the violations were corrected, **Ms. Gutta demanded Mr. Wann take a distorted and misleading photo of the kitchen and send it to the representative and dishonestly report that the violations were fixed**.

118. Mr. Wann refused to send this dishonest communication and Ms. Gutta was extremely upset with Mr. Wann for refusing to engage in this fraudulent conduct.

119. In May 2023, Mr. Wann witnessed multiple other health code violations in the kitchen.

120. On many occasions, Ms. Gutta would allow family members and other non-employees into the kitchen.

121. These people often ate their own food in the kitchen, touched sanitized areas, and created safety hazards in the kitchen.

122. As the Food and Beverage Director, it was Mr. Wann's responsibility to prevent these violations and ensure they were not repeated.

123. In response, Mr. Wann told Ms. Gutta multiple times that non-employees should not be in the kitchen because they are health code violations under Virginia law.

124. Ms. Gutta told Mr. Wann that she was the owner and "I can do what I want."

125. On June 17, 2024, Mr. Wann received a text from Ms. Hansford which stated, "per Kumar, they have decided to eliminate the Food and Beverage Director position."

126. Because of the size and operations of Natural Bridge Hotel, there is no possible way they are able to handle the food and beverage requirements without someone performing Mr. Wann's role, irrespective of what title Defendant chooses to call that position.

### COUNT I
### Defendant Interfered with Plaintiff's Rights in Violation of the FMLA, 29 U.S.C. § 2601, et seq.

127. Plaintiff re-alleges and incorporates by reference paragraphs 1-126 as if fully set forth herein.

128. At all relevant times, Defendant was covered by the FMLA because at all times relevant Defendant had 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

129. At all relevant times, Plaintiff was a covered employee because he had worked at the Natural Bridge Hotel at least 1,250 hours in the 12 months before the start of his request for leave.

130. Plaintiff's leave was for an FMLA qualifying reason because Plaintiff's father had an illness which required continuing treatment by a health care provider.

131. Defendant interfered with Plaintiff's rights under the FMLA by failing to notify Plaintiff that he would be eligible for FMLA leave when he contemplated resigning to care for his sick father.

132. Failure to notify Mr. Wann that he could qualify for FMLA leave constitutes interference under the FMLA.

133. Defendant interfered with Plaintiff's rights under the FMLA a second time by attempting to accept Plaintiff's "resignation letter" **after** Plaintiff submitted his request for leave under the FMLA. (See **Exhibit 5**.)

134. At no point did Plaintiff **ever** submit a resignation letter to Defendant and Defendant had already rejected Plaintiff's proposed future resignation prior to his request for FMLA leave.

135. Once Plaintiff learned that he could qualify for FMLA leave, he immediately told Ms. Hansford that he intended to seek leave under the FMLA rather than resign.

136. Attempting to accept Plaintiff's "resignation" constitutes interference under the FMLA.

137. Under 29 U.S.C. § 2617, Plaintiff is entitled to all damages which flow from that interference including all wages and benefits Plaintiff lost because of such interference, the cost of providing care because of such interference, reasonable attorney's fees, and costs.

## COUNT II
### Defendant Retaliated Against Plaintiff After He Exercised His Rights Under the FMLA in Violation of the FMLA, 29 U.S.C. § 2601, et seq.

138. Plaintiff re-alleges and incorporates by reference paragraphs 1-137 as if fully set forth herein.

139. Plaintiff engaged in protected activity when he exercised his rights under the FMLA by taking leave to care for his sick father.

140. In response to Plaintiff's protected activity, Defendant retaliated against him by taking numerous adverse employment actions on his return from FMLA leave. These actions included, but are not limited to:

   a. Plaintiff lost the ability to hire and fire his subordinates;

   b. Plaintiff no longer was able to access payroll;

   c. Plaintiff was required to "clock in" even though Plaintiff was paid a yearly salary;

   d. Plaintiff was no longer able to schedule employees; and

   e. Overall, Plaintiff's role as a manager was substantially limited.

141. Defendant further retaliated against Plaintiff by terminating him two months after he returned from FMLA leave.

142. Defendant's reason for Plaintiff's termination was that Defendant had "decided to eliminate the Food and Beverage Director position."

143. The close temporal proximity between Plaintiff's protected activity and his subsequent termination strongly supports a whistle-blower claim of retaliation.

144. Moreover, Defendant's decision to "eliminate" the Food and Beverage Director position and change his job duties is exactly what was contained in a note on his FMLA paperwork. (See **Exhibit 6**.)

145. Defendant's actions prove it never wanted Plaintiff to exercise his rights under the FMLA and punished him for doing so.

146. Because Plaintiff did exercise his rights under the FMLA, Defendant retaliated against him by limiting his job duties and eventually terminating him.

147. As a result of Defendant's violations of the FMLA, Plaintiff is entitled to all lost wages and benefits, interest on the amount of lost wages and benefits, an equal amount of the lost wages and benefits as liquidated damages, plus reasonable attorney fees and costs.

## COUNT III
### Violation of Virginia's Whistleblower Statute, Va. Code § 40.1-27.3

148. Plaintiff re-alleges and incorporates by reference paragraphs 1-147 as if fully set forth herein.

149. Defendant retaliated against Mr. Wann in violation of Va. Code § 40.1-27.3 when Mr. Wann consistently complained of violations of Virginia law. These complaints consisted of:

   a. Opposing Defendant's attempt to classify employees as 1099 independent contractors;

   b. Opposing Defendant hiring illegal immigrants;

   c. Refusing to serve alcohol without the appropriate liquor license;

   d. Refusing to lit to the Virginia Health inspector by misrepresenting that certain violations were corrected when they were not; and

   e. Making multiple complaints of health code violations.

150. Because Mr. Wann had to consistently inform Ms. Gutta of Virginia laws, he became the only obstacle to Ms. Gutta's attempts to violate Virginia law.

151. In response to Mr. Wann's multiple complaints of violations of Virginia law, Mr. Wann was terminated.

152. The only justification offered for his termination was that Defendant's decided to "eliminate the Food and Beverage position."

153. However, the duties performed by the Food and Beverage position cannot be eliminated because Defendant operates two restaurants, a conference center, and multiple other events which requires a food and beverage director.

154. Therefore, this reason for Plaintiff's termination only served as a pretext for Mr. Wann's termination.

155. Mr. Wann reported the violations to Ms. Gutta multiple times in good faith.

156. Under Va. Code § 40.1-27.3(C), Mr. Wann is entitled to compensation for wages and benefits he lost following his unlawful termination, along with pre-judgment interest of 6%, attorney fees, and costs.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Mr. Wann prays that judgment be entered in his favor and against the Defendant as follows:

a. That Defendant pay compensatory damages for interfering with Plaintiff's rights under the FMLA including all wages and benefits Plaintiff lost because of such interference and the cost of providing care because of such interference;

b.  That Defendant pay compensatory damages including lost wages and benefits, interest on the amount of lost wages and benefits, an equal amount of the lost wages and benefits as liquidated damages, for his unlawful termination in violation of the FMLA;

c.  That Defendant pay compensatory damages for wages and benefits he lost following his unlawful termination pursuant to Va. Code § 40.1-27.3(C);

d.  That Defendant pay Plaintiff compensatory damages of $100,000 for the mental suffering Plaintiff suffered as result of Defendant's unlawful behavior;

e.  That Plaintiff be awarded all reasonable attorney fees and costs, pursuant to 29 U.S.C. § 2617 and Va. Code Ann. § 40.1-27.3;

f.  That Plaintiff be awarded post-judgment interest; and

g.  That the Court award such other and further relief as is just, equitable, and proper.

**PLAINTIFF DEMANDS A JURY ON ALL ISSUES SO TRIABLE.**

January 23, 2025

JOSHUA WANN

By: */s/ Christopher E. Collins*
Christopher E. Collins

*Counsel for Plaintiff*

Christopher E. Collins (VSB No. 90632)
Mia Yugo (VSB No. 92975)
Dylan Craig (VSB No. 100709)
YUGO COLLINS, PLLC
25 Franklin Road, SW
Roanoke, Virginia 24011
Tel: (540) 861-1529
Direct: (540) 855-4791
chris@yugocollins.com
mia@yugocollins.com
*dylan@yugocollins.com*

*Counsel for Plaintiff*